UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM WHINEGLASS,
on behalf of himself and
those similarly situated,

      Plaintiff,

v.                      CASE No. 8:11-CV-2784-T-23TGW

KEVIN SMITH, O.D.,
and KEVIN SMITH, O.D. &
ASSOCIATES, INC.

      Defendants.

_____

## REPORT AND RECOMMENDATION

The plaintiffs in this collective action are former employees of Infinity Eye Care who allege that the defendants violated the Fair Labor Standards Act ("FLSA") by failing to pay them wages for hours worked in excess of 40 in a workweek. The defendants have filed motions to decertify the collective action (Doc. 45) and for summary judgment (Doc. 46). The motions were referred to me (Doc. 50).

Decertification of the collective action is warranted because the record shows that the plaintiffs are not similarly situated as required by the FLSA to proceed as a collective action.  Specifically, the circumstances surrounding each plaintiff's FLSA claim are distinct, and will require at trial individualized inquiries which are inconsistent with the purpose of a collective action.  Accordingly, I recommend that the motion for decertification be granted, and that opt-in plaintiffs Daniel Seltzer, Sheryl Evanson, and Jennifer Zambrana be dismissed from the case.

The defendants' motion for summary judgment focuses on whether the court has jurisdiction over the plaintiffs' FLSA claims, and the defendants' contention that they lacked knowledge of the plaintiffs' overtime hours.  The motion is moot with regard to the dismissed plaintiffs. Furthermore, the motion is not meritorious as to the named plaintiff William Whineglass because genuine issues of material fact exist regarding whether Whineglass was covered under the FLSA.  Moreover, there are factual disputes as to the defendants' actual and constructive knowledge of Whineglass's alleged overtime hours.  Accordingly, I therefore recommend that the defendants' Motion for Summary Judgment (Doc. 46) be denied.

I.

A.   The named plaintiff, William Whineglass, and the opt-in plaintiffs, Daniel Seltzer, Sheryl Evanson, and Jennifer Zambrana, are former employees of Infinity Eye Care.[1]   Defendant Kevin Smith is the owner of the defendant corporation, Kevin Smith, O.D. & Associates, Inc., which does business as Infinity Eye Care ("Infinity") (Doc. 55, ¶1).

Infinity is a full service eye care facility located in South Tampa which offers eye examinations, eyeglasses, and contact lenses (see id., ¶¶2, 13, 46). The defendants also operated a second location in Central Tampa from March 2009 until February 2012 (id., ¶¶3, 7, 8, 9). Smith avers that, during the pertinent time period, Infinity's annual volume of sales or receipts did not exceed $500,000 (id., ¶10).

From March 2009 until September 2010, Infinity's Central Tampa store was located at 1515 West Hillsborough Avenue (id., ¶¶3, 4). Seltzer previously ran his own eyeglass business from this location. Infinity

---

[1]Seltzer states that the location where he and Evanson worked was called 20/20 Vision Eye Clinic (Doc. 52, ¶9, lines 12-16). There is no dispute that Seltzer and Evanson were employed by the defendants. Consequently, for simplicity, all employees are referred to as former Infinity employees, as the defendants have characterized them (see Doc. 55, ¶¶5-7).

bought Seltzer's eyeglass business and leased the building from Seltzer (id., ¶5). Additionally, Seltzer and Evanson (who was Seltzer's former employee) were hired as opticians (id., ¶¶5, 6, 31). Their primary duties were to fit and manufacture prescription eyeglasses (Doc. 60-4, ¶2; Doc. 60-5, ¶2).

The Hillsborough Avenue location was open Tuesday through Saturday (Doc. 55, ¶33).[2] Seltzer and Evanson were scheduled to work from opening to closing, and were instructed to take a lunch hour each workday so that their  scheduled work hours would not exceed 40 on a weekly basis (see id., ¶¶34, 35).

However, Seltzer and Evanson claim that they regularly worked over 40 hours per week, and were not paid straight or overtime pay for hours worked over 40.  Specifically, Seltzer testified that he sometimes came in early, and stayed beyond closing for thirty minutes to an hour and one half, "[p]retty much almost every day" in order to complete lab work (Doc. 52, pp. 13-14).  Seltzer stated that he put in a lot of work and effort because he was

---

[2]Thus, the store was closed Sundays and Mondays.  The testimony differed as to its hours of operation on the other days.  Smith and Evanson stated that the office was open Tuesday through Friday, from 9:00 a.m. until 6:00 p.m., and Saturdays from 10:00 a.m. until 2:00 p.m. (Doc. 54, p. 6; Doc. 55, ¶33).  Seltzer testified that the office was open until 7:30 on Thursday evenings and until 4:00 p.m. on Saturdays (Doc. 52, p. 31).

"a company man," and he wanted the business to succeed since Smith bought Seltzer's eyeglass business and had an option to buy Seltzer's building (id., pp. 27, 29).

Evanson stated that she and Seltzer typically left work at 7:30 p.m. on weekdays, and at 4:00 or 5:00 p.m. on Saturdays (Doc. 54, p. 7). Evanson said that she worked late to complete insurance filings and to balance the books (id., p. 5). Additionally, she testified that they regularly worked through lunch breaks (id., p. 7).

Seltzer did not tell Smith the overtime hours he was working, nor does Seltzer recall complaining to Smith about working overtime (Doc. 52, pp. 26-27, 29). Rather, Seltzer stated that he thought Smith "realized how hard I worked for him" (id., p. 26). Seltzer acknowledged that, since he did not tell Smith he was working overtime, and Smith was not at the Hillsborough Avenue location on a daily basis, he "do[es]n't know" how Smith would have known how many hours he was working (id., pp. 27-28).

Evanson also did not tell Smith the specific number of overtime hours she worked in a given week (Doc. 54, pp. 8-9, 17). However, Evanson testified that she told Smith she was working a lot more than 40 hours a week,

to which Smith allegedly responded that he would try to hire someone else (id., p. 8).

Smith asserts that Infinity was unaware of Seltzer or Evanson working overtime (Doc. 55, ¶38). Thus, Smith states that no one informed him, or anyone at Infinity, that Seltzer or Evanson worked overtime hours (id., ¶¶32, 36, 50). Furthermore, Smith states that, since Seltzer and Evanson had a set weekly schedule which required less than 40 hours of work, and they worked at a "satellite" location, Infinity had no way to know that either of them worked overtime in a given week (id., ¶¶37, 38).

Infinity terminated Evanson's employment in July 2010. Seltzer's employment with Infinity ended in September 2010 when the defendants closed the Hillsborough Avenue location (id., ¶¶4, 7, 13, 14).

In late September 2010, Infinity relocated its Central Tampa location to 4710 Habana Avenue (id., ¶8; Doc. 63, p. 6). Whineglass was initially hired as an hourly-paid optician for the Habana Avenue location (Doc. 55, ¶17). About two weeks after the Habana Avenue location opened, Whineglass was promoted to office manager, and Infinity began paying

Whineglass on a salary basis (id., ¶¶19, 41; Doc. 63, pp. 20-21, 23). Infinity

then classified him as an "exempt" employee (Doc. 63, p. 20).

Whineglass stated that, as office manager, he "[t]ook part in every

... responsibility ... outside actually examining patients" (Doc. 51, p. 22). In

this connection, Whineglass stated (id., pp. 54-55):

> I was to take care of lab work, meaning making
> glasses, processing production orders for the
> patients and the nursing homes. I was responsible
> for the retail sales part, where I would fit the
> patients for the glasses, measure pupil area distance.
> I would help the patients choose their glasses. I
> was responsible for ... pretesting the patient for the
> doctor prior to being seen. I was responsible for
> getting authorizations for the insurance [] ....
> Having the files made for the patients to fill out for
> the doctor .... Tracking any denied claims from the
> billing department. Inputting files in the computer
> system. ... Researching the files to make sure that
> all payment and copays have been paid. Making
> sure the office was clean at the end of the night, and
> whatever else came up.

Whineglass also specified he did employee payroll and supervised employees

(id., pp. 14, 22, 37, 38; Doc. 55, ¶¶19, 21, 42).

Whineglass asserts that, until August 2011, when he was

demoted, he worked well over 40 hours weekly (Doc. 51, p. 59; Doc. 55, ¶¶22,

43). Specifically, Whineglass testified that he typically arrived at the store at

6:00 a.m., three hours before the office opened, and would stay three hours after the office closed (Doc. 51, pp. 15-17).  Whineglass stated further that he regularly worked all day on the weekends and brought work home (id., pp. 17, 24, 25).  In this regard, Whineglass said that he was busy running the office during the day, and time he spent working before and after business hours helped him "stay on top of" eyeglass production (id., p. 17).

Whineglass stated that he did not submit to Smith documentation of the hours he worked, or otherwise write down his work hours, because Smith told him it was unnecessary since Whineglass was classified as a manager (id., pp. 17-18, 26-27).  However, Whineglass stated that Smith knew he was at the store early because Whineglass asked Smith, after Whineglass was classified as a manager, if he was permitted to come in early.  Additionally, Whineglass stated that Smith had seen Whineglass there during non-business hours (id., pp. 16-17; see also id., pp. 25-26).

Smith, on the other hand, stated that Whineglass never told him that he was working overtime, and Whineglass never submitted overtime hours to Smith or anyone at Infinity (Doc. 55, ¶51).

Jennifer Zambrana, the fourth plaintiff, was a front desk employee who was hired in March 2011 (id., ¶¶26, 27). Zambrana's duties included answering telephones, scheduling appointments, assisting Smith with eye examinations, dispensing contact lenses, and confirming insurance coverage (id., ¶¶46, 47). Zambrana split her time between the Habana Avenue and South Tampa locations, and would travel between locations during her lunch break (Doc. 53, pp. 10-12; Doc. 55, ¶¶27, 29). She also assisted Smith with eye examinations at nursing homes (Doc. 53, pp. 11-12; Doc. 55, ¶27).

Zambrana's work schedule was 9 to 5, Monday through Friday, with a one-hour lunch break each day (Doc. 53, p. 10). However, Zambrana stated that she "always [worked] more than 40" hours weekly because she assisted Smith with patients until after 5:00 p.m., after which she would prepare the office for patients the following day (id., pp. 17-18). Consequently, Zambrana testified that she did not leave the office until 6 or 6:30 p.m. everyday (id., p. 17).

Zambrana stated that she talked to Smith and others about working overtime (id., pp. 22, 32-35). Although Mrs. Smith told Zambrana that she could not work overtime, Zambrana said that Mrs. Smith told her to

remain after the patients left in order to clean the office (id., pp. 23, 26).

Further, Whineglass testified that employees complained to him about

working overtime, to which Smith allegedly responded that "they need to stop

talking and do their work.  If they want a job, they'll keep their mouth shut"

(Doc. 51, p. 50).  Whineglass also asserts that, when he was given

responsibility for entering payroll information in the spring of 2011, Smith

directed him "to adjust any hours to show no overtime was worked" (id., p. 14;

see also id., p. 38).  Smith denies that Whineglass told him that employees

were working more than 40 hours (Doc. 63, p. 24).  Further, Smith asserts that,

although Zambrana requested a pay raise on occasion, Zambrana did not tell

him she was working overtime (Doc. 55, ¶52).

Whineglass's employment with Infinity was terminated on

October 28, 2011, and Zambrana was discharged the following month (id.,

¶¶24, 28).  The defendants closed the Habana Avenue location in February

2012 (id., ¶8; Doc. 63, p. 7).  Since that time, Infinity has operated only from

the South Tampa location (Doc. 55, ¶9).

B. On December 16, 2011, plaintiff Whineglass filed a complaint

against the defendants, alleging that they had violated the FLSA, 29 U.S.C.

201 *et seq.*, by willfully not paying him any wages for hours worked in excess of 40 in a workweek (Doc. 1). The plaintiff stated in his complaint an intention to pursue a collective action on behalf of similarly situated employees who were allegedly not paid overtime compensation (id., ¶¶5, 8). Accordingly, on September 13, 2012, the plaintiff filed a motion to conditionally certify an FLSA collective action pursuant to 29 U.S.C. 216(b) (Doc. 27). The proposed collective action was comprised of the plaintiff and former Infinity employees Zambrana, Seltzer, and Evanson, who consented to become plaintiffs in this case (id.; Docs. 9-12, 29-32).

The motion to conditionally certify the collective action was referred to me (Doc. 36). As I noted in my report and recommendation on that motion, the evidence presented by both parties was "meager and weak" (Doc. 42, p. 11). However, based on the lenient standard for conditional certification of collective actions, and the affidavits which indicated the existence of a common payroll practice that violated the FLSA, I recommended that the collective action be conditionally certified (id., pp. 11-12). I cautioned, however, that this was not a final determination, and that discovery may reveal that it is not prudent to try this case as a collective action

(id., p. 21).  The recommendation was adopted, and the proposed class was conditionally certified (Doc. 44).

Discovery in this case is now completed.  The defendants have filed a motion for decertification, arguing that a collective action is inappropriate because discovery shows there are distinct circumstances surrounding each plaintiff's overtime claim, and there is no common policy, decision or plan underlying the plaintiffs' claims of unpaid overtime compensation (Doc. 45).

Additionally, the defendants have filed a motion for summary judgment (Doc. 46).  The crux of this motion is that the court lacks jurisdiction over the plaintiffs' FLSA claims because the plaintiffs are not covered under the FLSA.  The defendants also contend that they are entitled to summary judgment on the FLSA claims because they lacked actual or constructive knowledge of the plaintiffs' overtime hours.[3]

---

[3]Additionally, the plaintiffs have requested, "[a]s an aside," in their opposition memorandum, summary judgment in their favor (Doc. 60, p. 7).  That request should be denied because it fails to comply with the Federal Rules of Civil Procedure and the court's Local Rules.  See Rule 56(a), F.R.Civ.P.; Local Rule 3.01(h).  Furthermore, such a request is clearly not meritorious because, as is apparent simply from the statement of facts, there are genuine issues of material fact as to the defendants' liability for these claims.

Both motions were referred to me for a report and recommendation if to be granted, and for disposition, if denied (Doc. 50). Oral argument has been conducted on the motions (Doc. 67). In light of the interrelationship of the two motions, it seemed appropriate to address both of them in this report and recommendation.

II.

The FLSA requires that employers pay their non-exempt employees time-and-a-half for hours an employee works in excess of a 40-hour workweek. 29 U.S.C. 207(a)(1). Further, the FLSA permits collective actions against employers brought by any employee "for and in behalf of himself ... and other employees similarly situated." 29 U.S.C. 216(b).

There is no guidance in the FLSA for determining how similar a group of plaintiffs must be before a collective action may proceed, nor has the Eleventh Circuit precisely defined the term "similarly situated." Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1259 (11th Cir. 2008), cert. denied, 558 U.S. 816 (2009). The Eleventh Circuit has, however, approved a two-tiered approach regarding collective action certification pursuant to

§216(b). <u>Hipp</u> v. <u>Liberty Nat. Life Ins. Co.</u>, 252 F.3d 1208, 1219 (11th Cir. 2001), <u>cert</u>. <u>denied</u>, 534 U.S. 1127 (2002).

Stage one of the process commenced in this case when the plaintiff filed a motion for conditional certification of the collective action. At that time, the court had minimal evidence before it – only the pleadings and affidavits. Further, the determination that the plaintiffs are similarly situated was made using "a fairly lenient standard" which "typically results in 'conditional certification' of a representative class." <u>Id</u>. at 1218 (<u>quoting</u> <u>Mooney</u> v. <u>Aramco Servs. Co.</u>, 54 F.3d 1207 (5th Cir. 1995)).

However, at the current stage, which was prompted by the defendants' motion for decertification, "the plaintiff[s] bear[ ] a heavier burden." <u>Morgan</u> v. <u>Family Dollar Stores, Inc.</u>, <u>supra</u>, 551 F.3d at 1261. Thus, the standard to show substantial similarity is more stringent because the court "has a much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity." <u>Id</u>.

Three factors that aid in determining similarity at the decertification stage are (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that

appear to be individual to each plaintiff; and (3) fairness and procedural considerations. Id. "[L]ogically, the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." Anderson v. Cagle's, Inc., 488 F.3d 945, 953 (11th Cir. 2007), cert. denied, 553 U.S. 1093 (2008). Furthermore, the Eleventh Circuit cautioned:

> [A]lthough the FLSA does not require ... class members to hold identical positions .... the similarities necessary to maintain a collective action under §216(b) must extend beyond the mere facts of job duties and pay provisions.... Otherwise, it is doubtful that §216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse.

Id. (quotations and citations omitted).

If it is determined at this stage that the named plaintiff and the opt-in plaintiffs are not similarly situated, the district court decertifies the collective action; the opt-in plaintiffs are then dismissed without prejudice; and the original named plaintiff continues to trial on his original claim. Hipp v. Liberty Nat. Life Ins. Co., supra, 252 F.3d at 1218.

### III.

### A. Disparate factual and employment settings of the plaintiffs

In examining whether the factual and employment settings of the plaintiffs are disparate, courts examine:

> (1) whether the plaintiffs all held the same job title; (2) whether they worked in the same geographic location; (3) whether the alleged violations occurred during the same time period; (4) whether the plaintiffs were subjected to the same policies and practices, and whether these policies and practices were established in the same manner and by the same decision-maker; and (5) the extent to which the actions which constitute the violations claimed by plaintiffs are similar.

Bedoya v. Aventura Limousine & Transp. Service, Inc., 2012 WL 1933553 at *4 (S.D. Fla.); Echevarria v. Las Vegas Beach, Inc., 2010 WL 2179747 at *2 (S.D. Fla.).

These factors show that the plaintiffs in this case are not similarly situated. First, the plaintiffs did not hold the same job title. Thus, the named plaintiff, Whineglass, was an office manager for the majority of his employment with the defendants, and none of the opt-in plaintiffs were office managers or had managerial responsibilities. Significantly, the crux of Whineglass's claim concerns overtime hours that he allegedly worked when he was the office manager (see Doc. 51, pp. 18, 59), to which the defendants will assert an executive exemption defense. In contrast, Seltzer, Evanson, and

Zambrana were hourly-paid employees who indisputably were not exempt from overtime compensation (Doc. 63, pp. 20, 21, 23, 28). Therefore, the issue of whether Whineglass is exempt from overtime compensation as an office manager is unique to him.

Further, Seltzer and Evanson worked for the defendants in a different location and during a different time period than Whineglass. Thus, Seltzer and Evanson worked at the Hillsborough Avenue location, which preceded the Habana Avenue office where Whineglass and Zambrana were employed (Doc. 55, ¶¶8, 10, 11). Significantly, the evidence shows that the practices and policies of these locations were different, and the circumstances underlying the plaintiffs' claims of unpaid overtime compensation violations are dissimilar.

For example, Zambrana, who was a front desk receptionist and assistant to Smith during eye examinations, claims that she was essentially required to work unpaid overtime hours to assist Smith with patients who were being seen after her 5:00 scheduled departure time, and to clean the offices after the patients left (Doc. 53, p. 23). Furthermore, Zambrana testified that she split her time between the two Infinity locations and was not paid for

travel time, which she did on her lunch break (see id., pp. 10-12). Zambrana's allegations that she was essentially required to work overtime to assist with patients and ready the office for the following day, and her claim that she was entitled to compensation for her travel time, are unique to Zambrana.

In contrast to Zambrana, Seltzer and Evanson were opticians at the Hillsborough Avenue location who claim that they worked overtime hours to complete lab work and do administrative tasks (see Doc. 52, pp. 13-14; Doc. 54, p. 5). Unlike Zambrana, who essentially alleges that she was told to work beyond her scheduled hours, neither Seltzer nor Evanson testified to a directive that compelled them to work overtime hours.

To the contrary, Seltzer stated that he worked a lot because he was "a company man" who wanted the business to succeed (see Doc. 52, p. 29). Seltzer stated further that he does not know how Smith would have known the overtime hours he was working because Smith was not at that office on a daily basis (see id., pp. 28-29). Seltzer's circumstances that he did not tell Smith about his overtime hours and that he was personally motivated to work overtime are unique to Seltzer. See Reich v. Department of Conservation and Natural Resources, State of Ala., 28 F.3d 1076 (11th Cir.

1994)(discussing actual or constructive knowledge of the uncompensated overtime); 29 C.F.R. §785.11 (the inquiry is whether the employer "knows or has reason to believe" that the employee is working).   Thus, the other plaintiffs assert they complained to Smith about working unpaid overtime hours.

Moreover, the defendants have raised the issue of whether the plaintiffs are even covered under the FLSA (see Doc. 46).   As discussed in section IV, in order for the plaintiffs to prove that they are individually covered under the FLSA, each plaintiff's job duties will need to be scrutinized to determine whether each plaintiff participated in interstate commerce. See Thorne v. All Restoration Services, Inc., 448 F.3d 1264, 1265-66 (11th Cir. 2006).   In this regard, Zambrana's connection is most tenuous, and therefore, her claim may not be cognizable at all.

In sum, the plaintiffs have not shown that they are similarly situated with regard to their factual and employment settings.   Rather, the circumstances surrounding each claim are distinct and will require individualized inquiries at trial.   This circumstance favors decertification of the collective action.

The plaintiffs argue, unpersuasively, that any concern about the plaintiffs' disparate employment circumstances is assuaged by the defendants' common "decision, policy or plan" to violate the FLSA (Doc. 61, p. 3). However, the evidence does not support the existence of a decision, policy, or practice to violate the FLSA that commonly underlies the plaintiffs' claims.

Plaintiffs' counsel argued at the hearing that Infinity's hours of operation constitutes a policy that violated the FLSA. However, according to Evanson's and Smith's testimony, the business hours at the Hillsborough Avenue location totaled 40 hours weekly, so that would not violate the FLSA. Further, even accepting Seltzer's testimony of longer store hours, Seltzer's and Evanson's scheduled work hours would not exceed 40 hours weekly after taking into account their designated lunch breaks.

Additionally, Zambrana was not scheduled to work Infinity's hours of operation. Thus, Zambrana testified that her official work schedule was from 9:00 to 5:00, Monday through Friday (see Doc. 53, p. 10), which is fewer hours than either location's hours of operation. Consequently, any alleged FLSA violation with regard to Zambrana was not by virtue of Infinity's official hours of operation. Moreover, the focus of Whineglass's

unpaid overtime claim is a multitude of hours he allegedly worked before and after business hours, and at home (see Doc. 51, pp. 16-17). Therefore, the plaintiffs have failed to show that Infinity's hours of operation constitute a "decision, policy or plan" by the defendants to violate the FLSA.

In their opposition memorandum, the plaintiffs argue that the defendants' decision or policy that violated the FLSA was Smith's scheduling of patients late in the day, so that the business was open "often past 6 p.m. or until all patients had been examined and the office prepped for the following day" (Doc. 61, pp. 4-5). The plaintiffs allege further, without specific citations to the record, that this policy or practice was common to all four plaintiffs (see id., p. 5).

However, Zambrana was the only plaintiff who allegedly worked beyond her scheduled hours to assist with patients and to prepare for the following day. In fact, Seltzer and Evanson do not even mention assisting Smith with eye examinations as part of their duties. Rather, Whineglass and Seltzer testified that they worked overtime hours making eyeglasses, and Evanson testified she spent overtime hours doing filing and balancing the books.

.

In sum, although the evidence could establish that each plaintiff was denied overtime pay, they have not proffered substantial evidence of a common decision, plan, or policy by the defendants to violate the FLSA. See, e.g., Briggins v. Elwood TRI, Inc., 882 F.Supp.2d 1256 (N.D. Ala. 2012) (denying collective action because there was no common decision, policy or plan to work off the clock); Lugo v. Farmer's Pride Inc.,737 F.Supp.2d 291, 303 (E.D. Pa. 2010)(denying collective action because "the evidence does not demonstrate .... that the question of undercompensation can be answered in a manner common to all plaintiffs").

B. Defenses

The second factor considered in determining the propriety of a collective action is whether the potential defenses at issue relate to the class as a whole or will be raised with respect to each individual plaintiff. Lugo v. Farmer's Pride Inc., supra, 737 F.Supp.2d at 300. As indicated, the defendants will likely raise different defenses with respect to different plaintiffs. Most notably, the defendants will argue that Whineglass is subject to an executive exemption defense that is inapplicable to the other plaintiffs. 29 U.S.C.

213(a)(1)("any employee employed in a bona fide executive ... capacity" is exempt from overtime compensation).

Further, the defendants mentioned at the hearing that they would assert a portal-to-portal defense as to Zambrana, if Zambrana alleges entitlement for time spent traveling between offices and to off-site facilities where she assisted Smith with eye examinations. See 29 U.S.C. 254. Moreover, the defendants may argue that Seltzer's deposition testimony that he did not tell Smith he was working overtime (see Doc. 52, pp. 26-29) shows that they lacked the willfulness and bad faith for an award of liquidated damages as to him. See Morgan v. Family Dollar Stores, Inc., supra, 551 F.3d at 1282 (court has discretion to deny or reduce liquidated damages if the action was in good faith and the employer had reasonable grounds for believing the act or omission was not in violation of the FLSA).

In sum, the individual defenses further highlight the distinctions between the plaintiffs' claims and, therefore, favor decertification. See Lugo v. Farmer's Pride Inc., supra, 737 F.Supp.2d at 300–01 ("Because individualized defenses prevent an efficient proceeding with a representative class, several courts have granted motions for decertification on this basis.");

<u>Martin</u> v. <u>Citizens Financial Group, Inc.</u>, 2013 WL 1234081 at *8 (E.D. Pa.) (plaintiffs' disparate factual and employment settings and individualized defenses require that the collective action be decertified).

C. <u>Fairness and procedural issues</u>

Collective actions under the FLSA allow the judicial system to efficiently resolve the claims of multiple plaintiffs in one proceeding where those claims contain common issues of law and fact arising from the same alleged unlawful conduct. <u>See</u> <u>Hoffmann-La Roche, Inc.</u> v. <u>Sperling</u>, 493 U.S. 165, 170 (1989).   However, judicial economy is not served in this circumstance because each plaintiff's claim raises distinct factual and legal issues which would essentially evolve into four distinct trials.  The need for such individualized inquiries contravenes the "basic theory of judicial economy upon which the certification of collective actions is based." <u>West</u> v. <u>Verizon Communications, Inc.</u>, 2009 WL 2999181 at *3 (M.D. Fla.); <u>see also</u> <u>Pacheco</u> v. <u>Boar's Head Provisions Co., Inc.</u>, 671 F.Supp. 957 (W.D. Mich. 2009) (individualized inquiries are "the antithesis of collective action treatment and would ... eliminate any judicial efficiency that might be gained through a collective approach").

Furthermore, trying four different claims in one trial unnecessarily complicates the case. See Johnson v. Koch Foods, Inc., 657 F.Supp.2d 951 (E.D. Tenn. 2009); In re Beverly Hills Fire Litigation, 695 F.2d 207, 216 (6th Cir. 1982), cert. denied, 461 U.S. 929 (1983)(consider potential prejudice to the parties and potential confusion to the jury in determining the propriety of a collective action). Moreover, it also increases the possibility of prejudice to the defendants if the circumstances of one plaintiff's claim are erroneously attributed to others. For example, Whineglass alleges that, at the Habana Avenue office, Smith directed him "to adjust any hours to show no overtime was worked" (Doc. 51, p. 14); however, that statement is irrelevant to Seltzer's and Evanson's claims because, in addition to allegedly being made after their employment ended, Evanson and Seltzer stated that they never told Smith how many overtime hours they worked.

The plaintiffs argue that "it is in the interest of judicial economy for the matter to be tried collectively" because "[t]he case in its simplest form involves determining the number of hours each of the four employees worked in excess of 40 in a workweek.... The other consideration ... is whether William Whineglass was exempt during the time frame he was purportedly

promoted to 'manager'" (Doc. 61, p. 5).  However, as explained above, the evidence indicates that this matter is not that simple.

In sum, any efficiency gained through bringing this action collectively would be outweighed by the substantial likelihood of distinct trials, and the risk of confusion and prejudice.  Accordingly, fairness and procedural considerations favor decertification of the collective action.

In conclusion, the plaintiffs have failed to show that they are similarly situated for the purpose of proceeding to trial as a collective action. See 29 U.S.C. 216(b).  Accordingly, I recommend that the collective action be decertified and the opt-in plaintiffs be dismissed without prejudice.  See Hipp v. Liberty Nat. Life Ins. Co., supra, 252 F.3d at 1218.

## IV.

As indicated, the defendants have also filed a motion for summary judgment (Doc. 46).  Since it is recommended that the claims of Seltzer, Zambrana and Evanson be dismissed, this motion is moot as to those plaintiffs.  Furthermore, the motion is not meritorious as to the remaining plaintiff, William Whineglass.

A. The defendants argue first that they are entitled to judgment as a matter of law on Whineglass's FLSA claim because he is not entitled to coverage under the FLSA. To qualify for relief under the FLSA, an employee must demonstrate "enterprise coverage" or "individual coverage." Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1298 (11th Cir. 2011); 29 U.S.C. 207(a)(1). Contrary to the plaintiff's memorandum (Doc. 60, p. 3), the burden is on the plaintiff to show that he is covered under the FLSA. See Josendis v. Wall to Wall Residence Repairs, Inc., supra, 662 F.3d at 1298. The plaintiff argues that he qualifies for both types of FLSA coverage.

An employee is subject to enterprise coverage if he is "employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. 207(a)(1). This provision requires evidence that the employer (1) has at least two employees engaged in interstate commerce or the production of goods for interstate commerce, or who handle, sell, or otherwise work on goods or materials that had once moved or been produced for in interstate commerce; and (2) has gross sales of at least $500,000 in sales annually. Josendis v. Wall to Wall Residence Repairs, Inc., supra, 662 F.3d at 1317; 29 U.S.C. 203(s)(1)(A)(i)-(ii).

There is no dispute that Infinity meets the first prong of the statute. However, the defendants argue that "Infinity Eye Care does not have an annual dollar volume of sales over $500,000, and therefore is not covered by 'enterprise coverage' under the FLSA" (Doc. 46, p. 9). In support of this contention, the defendants submit the affidavit of Smith, who avers that "[d]uring all years at issue, Kevin Smith, O.D. & Associates, Inc.,'s annual volume of sales or receipts never exceeded $500,000" (Doc. 46-1, p. 2, ¶10). This evidence, however, fails to show Infinity does not meet the revenue requirement. Thus, an employer satisfies the revenue requirement if it generates sales of $500,000 or more, and Smith's averment that the company's sales "never exceeded $500,000" leaves open the possibility that it made $500,000 annually. If Smith meant to say that company sales never reached $500,000 annually, he said it wrong.

Regardless, it is not the defendants' burden to disprove enterprise coverage; it is the plaintiff's burden to show that it exists. See United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991). It does not appear that the plaintiff carried his burden. The plaintiff argues that Infinity meets the sales requirement because "just eye examination sales

revenues, alone, without any sales of glasses or contact lenses, exceed

$500,000" (Doc. 60, p. 3). Specifically, the plaintiff avers (Doc. 60-2, ¶11):

> Infinity eye care charged $85.00 per eye exam and
> between both locations we average 105 eye exams
> per week, which is $9,775 per week or
> approximately $508,000 per year[. T]his factor does
> not include the amount obtained from nursing home
> examinations which would approximately be 10 per
> week. ... These figures do not factor in eyeglasses
> sales or contact lenses at the location or the on-line
> contact ordering website for Infinity Eye Care or
> medical office visits which would greatly exceed
> the revenue from our eye exams.

The plaintiff's affidavit, however, fails to set forth any basis for his personal

knowledge of Infinity's annual revenue from eye examinations, or any other

service it offers.  Rule 56(c)(4), F.R.Civ.P., requires that "[a]n affidavit....

used to support or oppose a motion must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated."  Since Whineglass's

affidavit does not meet these requirements, it does not constitute probative and

admissible evidence of Infinity's revenue.  See Josendis v. Wall to Wall

Residence Repairs, Inc., supra, 662 F.3d at 1302 (the plaintiff's belief that his

employer's sales exceeded $500,000 based on estimates of the amount of work

done by the business and charges for that work was insufficient to show the business's sales exceeded $500,000). Thus, as the Eleventh Circuit stated in Josendis v. Wall to Wall Residence Repairs, Inc., supra, 662 F.3d at 1318, at the summary judgment stage, "evidence consisting of one speculative inference heaped upon another [i]s entirely insufficient." Accordingly, the plaintiff has failed to show that Infinity's gross sales met the requirement for enterprise coverage.

In the event an employer is not considered an "enterprise" pursuant to the FLSA, the employer may still be subject to the requirements of the FLSA if the employee (1) engaged in commerce, or (2) engaged in the production of goods for commerce. 29 U.S.C. 207(a)(1); Thorne v. All Restoration Services, Inc., supra, 448 F.3d at 1265-66.

An employee is "engaged in commerce" if he "directly participat[es] in the actual movement of persons or things in interstate commerce." Id. at 1266. The "'engaged in commerce' phrase is to be given a broad, liberal construction." Alonso v. Garcia, 147 Fed. Appx. 815, 816 (11th Cir. 2005). An employee satisfies this requirement by (i) working for an instrumentality of interstate commerce, e.g., transportation or communication

-30-

industry employees, or (ii) regularly using the instrumentalities of interstate commerce in his work, e.g., regular and recurrent use of interstate telephone, telegraph, mails, or travel. Thorne v. All Restoration Services, Inc., supra, 448 F.3d at 1266. The Eleventh Circuit has cautioned that "application of the FLSA to varying situations is essentially a line-drawing exercise." Alonso v. Garcia, supra, 147 Fed. Appx. at 816.

The plaintiff argues, in a vague manner, that he "participated in the actual movement of persons or things in interstate commerce" (Doc. 60, p. 5). In this regard, the plaintiff attests (Doc. 60-2, ¶4):

> [M]y primary duty [at Infinity] entailed the manufacturing of eye glasses and ordering prescription eyeglass lenses from Optogenics of Syracuse, located at PO Box 4894 Syracuse NY. Infinity Eye [C]are utilized multiple lens manufacturers with Optogenics being primary. Approximately 80% of the lenses that Infinity Eye Care used in crafting eyeglasses came from Optogenics.

The plaintiff stated further that he or the staff would "send the patient's eyeglass prescription to Optogenics of Syracuse, and Optogenics of Syracuse would craft the lenses in New York and ship them to Infinity Eye Care in Tampa.... [T]he lenses sent from New York would be edged by myself and

crafted to fit in the frame that had been selected by the patient(s)." (Doc. 60-2, ¶¶5, 6).

The plaintiff's use of the instrumentalities of interstate commerce to place orders for eyeglass lenses with an out-of-state manufacturer is sufficient to create a genuine issue of material fact regarding whether the plaintiff "engaged in commerce" pursuant to the FLSA. See Silk v. Albino, 2007 WL 853752 (M.D. Fla.) (Merryday, J.) (plaintiff's affidavit that her duties included regular use of the channels of interstate commerce such as the internet, telephone and mail, to order products outside of Florida created a factual issue as to whether the plaintiff was individually covered under the FLSA); Lopez v. Pereyra, 2010 WL 335638 at *6-*7 (S.D. Fla.)(plaintiff's averment that she regularly used the telephone to call businesses outside of Florida to order medications and devices for patients creates a genuine issue of material fact whether she qualifies for individual coverage under the FLSA); see also 29 C.F.R. §776.10(b) (since "commerce" as used in the Act includes ... "communication" itself "employees whose work involves the continued use of the interstate mails, telegraph, telephone or similar instrumentalities for communication across State lines are covered by the

Act." Therefore, "if the employee, as a regular and recurrent part of his duties, uses such instrumentalities in ... orders for goods ... across State lines ... he comes within the Scope of the Act").[4]

Although it is unclear how frequently the plaintiff placed orders with the out-of-state manufacturer, and he does not specify in his affidavit which instrumentality of commerce he used to place the orders, viewing the evidence in the light most favorable to the plaintiff, there is a genuine issue of material fact as to whether the plaintiff "engaged in commerce" as that term is defined in the FLSA and, concomitantly, whether he qualifies for individual coverage under the FLSA.

The plaintiff also asserted during oral argument that his job duties constituted the "production of goods for commerce," which is another method for establishing individual coverage under the FLSA. See 29 U.S.C. 207(a)(1). In this regard, the plaintiff states that he "manufacture[d] eye glasses" using "components purchased from all over the United States" (Doc. 60, p. 5). This argument, however, is undeveloped. Thus, the plaintiff does

---

[4]Although Whineglass's affidavit mentions eyeglass frames from out-of-state manufacturers, Whineglass does not allege that he ordered those items or otherwise regularly communicated with out-of-state eyeglass frame manufacturers (Doc. 60-2, ¶7).

not cite to any analogous caselaw showing that his activity constitutes "production of goods for commerce." To the contrary, there is legal authority indicating that this provision requires evidence that the employer intended or expected "at the time of production" for the goods to move in interstate commerce. United States v. Darby, 312 U.S. 100, 118 (1941); 29 C.F.R. §776.21 (goods are produced for commerce when the employer intends, hopes, expects, or has reason to believe that the goods he produced will move in interstate or foreign commerce). In this case, the plaintiff does not allege that the eyeglasses he manufactured were intended for interstate commerce. To the contrary, Smith avers that Infinity services customers in the Tampa area and does not advertise or sell out-of-state (Doc. 55, ¶2). Therefore, the plaintiff has not established that he was engaged in the "production of goods for commerce."

In all events, the plaintiff's affidavit indicating that he regularly placed orders for eyeglass lenses with an out-of-state company is sufficient to create a genuine issue of material fact regarding whether the plaintiff engaged in commerce and, concomitantly, whether he is individually covered under the

FLSA.  Accordingly, summary judgment is appropriately denied on this ground.

B. The defendants also seek summary judgment on the ground that the plaintiff "fail[ed] to show Infinity knew or should have known of any overtime worked" (Doc. 46, p. 11).  See Reich v. Department of Conservation and Natural Resources, State of Ala., supra, 28 F.3d at 1082 (in order to prove a FLSA violation, the employer must have "actual or constructive knowledge" of the overtime violation).  This contention is not meritorious because Whineglass testified at his deposition that Smith was aware he worked overtime hours.  Specifically, Whineglass testified that Smith had seen Whineglass working at the office during non-business hours (see Doc. 51, pp. 16, 25).  Furthermore, Whineglass testified that he asked Smith when he became the office manager if he was permitted to come in early (id., pp. 16-17), after which Whineglass allegedly came to the store hours before the scheduled opening time (id.).  Therefore, there is a genuine issue of material fact regarding whether the defendants had actual or constructive knowledge of Whineglass's alleged overtime hours.

For the same reason, the defendants' contention that they are entitled to summary judgment on the issue of liquidated damages (Doc. 46, p. 13) is not meritorious.   Accordingly, the defendants are not entitled to summary judgment on this issue.

V.

For the reasons stated, decertification of the conditionally certified class action is warranted.  Accordingly, I recommend that the motion for decertification be granted, and that the claims of Seltzer, Evanson and Zambrana be dismissed without prejudice. Further, as just explained, I recommend that the motion for summary judgment be denied.

Respectfully submitted,

THOMAS G. WILSON
DATED: MAY _3_, 2013         UNITED STATES MAGISTRATE JUDGE

NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).